Good morning, everybody. Please be seated. Welcome to the United States Court of Appeals for the Fourth Circuit. We have four cases on for argument this morning. We'll begin with 24-2264, Davis v. Bimbo Foods Bakeries. Mr. Levine. Good morning, your honors. May it please the court. I'm Randall Levine for Bimbo Food Bakeries Distribution, the appellant. The purely legal issue before the court this morning is whether a Kroger automated fulfillment center is an outlet under the contract, which is defined as a retail store that purchases products by store door delivery. The answer to that question is no, and the judgment below should be reversed because the district court rewrote the unambiguous terms of the party's contract in a manner that is inconsistent with the agreement's text and context. First, I want to address the correct interpretations of retail store and store door delivery. Well, first, what's your best argument that it is unambiguous? The parties agreed that it was unambiguous on summary judgment and agreed on the ordinary meaning of the term taken directly from Webster's Dictionary. That was a place of business in which products are sold to consumers. And that, by its very terms, does not describe the center, which is a 350,000 square foot warehouse that is closed to the public, and all it does is store and sort products before shipping them to online purchasers or to other Kroger facilities across three different states. It is nothing like the kinds of- Webster's Dictionary- Mr. Levine, can I ask a question about that? Is there a distinction to be made between the ultimate recipients of the goods? In this case, you just said that some goods are delivered to online purchasers, other to distributors. So Mr. Davis, I think, had an expectation that he would service stores that ultimately sold goods to retail consumers. So why isn't the fact that these goods are in fact being purchased, albeit online, by retail consumers dispositive, notwithstanding the fact that they are being distributed via this warehouse? The difference is important. It's a functional difference, and it's a textual difference. The functional difference is important because it goes directly to the intent of the parties and the underlying purpose of this contract. An independent distributor like Davis has a job of not merely just delivering goods to a retail store. But also interacting with the retail store and interacting with the managers of the retail store and placing items on the shelves, rotating the products on the shelves, promoting products, promoting advertising campaigns. The goal is to maximize the sales to the retail store and then to maximize the retail store's sales to the end users. None of that can be accomplished at the center. The center is just a warehouse. No one is allowed to enter the warehouse. There are no shelves to stock. There are no customers inside. The purpose of this independent distributor agreement cannot be fulfilled at this particular kind of facility. Can that purpose be fulfilled at a restaurant, which is part of the contract? Yes, it can. How do you stock shelves and advertise at a restaurant? Yeah, not every restaurant, right? But if you've ever been to a Cracker Barrel, for example, there's a retail store component where you can buy little Debbie cakes and other kinds of baked goods there. And there's a lot of similar restaurants. And that's a part of Bimbo's business. Does the contract only cover those restaurants? It covers, it says restaurants, right? But there has to be a reason for the restaurant to be purchasing products by store door delivery. It has to purchase these products from Bimbo for some reason. If the restaurant doesn't purchase these products, then obviously there's no reason to service it. The same is true for institutional accounts. Although Mr. Davis hasn't argued that the center here is either a restaurant or an institutional account. But- Mr. Levin, I'm sorry to interrupt you, but just to follow up, at what point would Mr. Levin, Mr. sorry, Mr. Davis have an argument that he is not receiving the benefit of his agreement? Say, for example, these warehouses continue to proliferate throughout his service area to the extent that he, the products are no longer being delivered by him, but being delivered via this distribution center to these retail consumers. Would he have an argument that he's lost the benefit of his bargain if that continues? I mean, I know that's not the case right now, but I think maybe that's what he was concerned about is that he's being priced out or being pushed out an agreement that he signed. And how long ago was this when he entered into it?  Okay. And at that point, I would imagine that these warehouses, although they existed, were not quite as ubiquitous as they appear to be now. So has he lost the benefit of his bargain? Well, he certainly hasn't yet. Mr. Davis is still servicing exactly the same kinds of outlets that he was serving from 2011 on to this very day. And as far as I know, possibly even serving Kroger outlets, because Kroger does still operate outlets, both under the Kroger name and under other names. This particular Kroger facility is not an outlet. That's the distinction. And it may be that this model grows and BMO is not responsible for changing market conditions or how Kroger decides to operate its business. However, the record did show, and it was undisputed, that in other markets, other independent distributors like Mr. Davis enter into separate contracts with BMO where there is an ability for them to serve an e-commerce fulfillment center. Everyone understands that the original distributor agreement doesn't cover those kinds of facilities, so they have to enter into a new contract. That's not possible for the Kroger facility here. And that goes to another important distinction, which is that to be an outlet, you have to not just be a retail store, you also have to purchase products by store-door delivery. And the outlet here, or sorry, the center here, does not purchase any products by store-door delivery or otherwise. Kroger purchases- Oh, I'm sorry. Is that defined in the agreement, store-door delivery? Is that defined anywhere? No, that is a term that has an important meaning within the context of this contract. And it's a full phrase. It's not just store-door delivery. And within the context, I'm sorry, I do want you to finish answering Chief Judge Diaz's question, but I'm still, at the beginning, you said this was unambiguous and everybody agrees it's unambiguous, but didn't the district court find that there was an ambiguity in the context of this case? The district court found an ambiguity. We think that was wrong. And the court- Go ahead and answer Chief Judge Diaz's question, and then you can come back to trying to explain why you think that was wrong. Okay. So the full phrase is purchase by store-door delivery. And the district court erred in part by taking purchase out of the phrase. And what that refers to is the business model that BIMBO uses to service these outlets. Individual grocery stores or convenience stores or other outlets will purchase product directly from distributors like Mr. Davis. Mr. Davis purchases products from BIMBO to resell to individual outlets. That entire business model, which BIMBO refers to as store-door delivery and refers to as purchasing by store-door delivery, that simply does not apply to the center either. The fulfillment center doesn't purchase products. Kroger, at the corporate level, purchases products by submitting one purchase order directly to suppliers. Many, many thousands of suppliers that will then find ways to ship the products to this 350,000 square foot warehouse. That is nothing at all like the process of purchasing by store-door delivery that Mr. Davis is so good at and has been doing it since 2011 with grocery stores and convenience stores and other similar outlets that purchase directly from him. And he is responsible for ordering. And he is responsible for making sure that the grocery store or whatever outlet has sufficient product on hand for the customers that it expects. And he is responsible for making sure that the product isn't stale and that it's placed well on the shelves. Just absolutely none of that happens at the center. The center is operated by robots. And that's important because that's the intent of this agreement. And the intent of the agreement is actually very well articulated in section 4.1, which the district court decided to ignore, but there's important context clues there. If you look at section 4.1, it's called results. And it describes exactly what a distributor like Mr. Davis is supposed to do at an outlet. And by describing what distributors do at outlets, it also describes what an outlet is, right? An outlet is a place where a distributor can stock shelves. It is a place where a distributor can promote product. It is a place where a distributor can develop relationships and maximize sales. Those context clues are really important because not only do they modify and give content to direct store door delivery, they also modify and give content to retail store, such that even if there was another definition of retail store to choose from, and there's not, a retail store within the context of this agreement would still have to be a place where those things are possible. Otherwise, the agreement makes no sense. And there would be no reason to use a distributor like Mr. Davis for a place where none of those services can be provided. If Beanbo had wanted to enter into a contract for warehouse delivery, simply dropping product off at the back of a building, Beanbo could do that. And Beanbo does do that for certain contracts. But that's not what this contract is about. And Mr. Davis knows that and understands that.  Didn't the district court conduct a trial and make fact findings? Yes. And aren't those given some measure of deference? Well, thank you for raising that because that- You're welcome. That was really compounded error on top of error. It was error for the court to find that these terms were ambiguous and to ignore the ordinary meaning from the dictionary term of retail store, to ignore the context clues within the contract that helped to define direct store delivery. And as a result, there was no need for the court to hear any evidence whatsoever to interpret what is a question of law. An interpretation of a contract is a question of law for the court based upon the contract in front of it. The district court's effort to support what it ultimately did was rewrite the contract using what it called parole evidence and course of dealing. This was just further error. The material facts were always undisputed. The trial added nothing useful to the analysis. What happened was Davis called three witnesses. That was really the only additional evidence. And those witnesses unsurprisingly testified that they agreed with Davis. But that isn't parole evidence. Parole evidence is written or oral agreements prior to contracting that shed light on the intent of the parties. That's what parole evidence is. The opinions of three witnesses are not parole evidence. It wasn't course of dealing evidence either because none of them were parties to the contract between Davis and Bimbo. And so they simply had nothing relevant to say about course of dealing. And it also wasn't evidence of trade usage, which might be admissible because trade usage is evidence about practices within the industry that are so well-established that they can be regarded as incorporated into the contract. None of Davis's witnesses testified as experts about the industry. They don't have that- Okay, so back to the ambiguity issue. Is your argument on that that you can look at the contract and everybody understands what it means and it says what it means and it means what it says and reasonable minds can't differ? Is that your argument as to why the court was wrong in finding the contract ambiguous? Yes, that's exactly it. And that is especially so with respect to retail store. And you can see that that is true because of the way the district court needed to treat retail store and the way the district court knew the ordinary meaning definition that the parties had agreed upon from the dictionary and decided to simply reject that. Not because it was unclear or not because- What difference do we owe to the district court in its finding that the contract was susceptible, reasonably susceptible to multiple interpretations and so it's ambiguous? Zero difference. That's a question of law for the court. So that's reviewed de novo. And the court below clearly got that wrong. There was no sense and the district court did not find that the ordinary definition of retail store couldn't be applied in this contract in a sensible way. It could be applied in a sensible way. The sensible way to apply it was to conclude that it does not apply to the fulfillment center. So what the district court did was say, I don't like that definition and it simply invented a new one. It concluded that the definition of retail store was so elastic that it does not exclude a retailer that takes orders from customers online without the customers entering a brick and mortar location. But that definition comes from no dictionary. It seemed to me the district court did. I mean, it used the dictionary definition and just explained what it includes and what it doesn't include. It says that the definition is a place of business that sells goods directly to the consumer. And then it explained, that's the definition. That definition doesn't exclude a place that completes the transaction, right? Just the consumer giving money and placing an order doesn't sell goods. That's not complete. The district court just explained that definition that everybody agrees on doesn't exclude what happened here. But there is a distinction because that's not the definition that everybody agreed on. The definition that everybody agreed on from the dictionary is a place of business in which products are sold to customers. And you got that from? Webster's dictionary. Online? Yes. The current version, not the version that existed at the time of the contract? I believe that's right. Did the district court have to accept the in which that everybody agreed on? If it's a question of law? The rule under Pennsylvania law is that a court can look to a dictionary for the ordinary meaning of a common term with a common sense usage. The Pennsylvania doesn't say that the district court can edit it as the district court sees fit. So it just seemed to me you were really emphasizing that contract interpretation is a question of law and parties can't stipulate to the law, can they? Well, I'm not sure. I mean, parties can agree not to dispute something and the parties can agree that this was the ordinary meaning of the term. So your point is in which does a lot of work and that was essential and the district court didn't include in which in its definition. Not just in which. Also, products are sold to consumers because that's an important distinction. The facility here does not sell anything. Kroger at the corporate level sells things on its website. It stores the products that it sells in a warehouse. That does not mean that the warehouse itself is selling products unlike a grocery store where products are actually sold to consumers and that's a meaningful and functional difference and it matters to the purpose of the agreement and it matters to the intent of the parties. Again- Mr. Levine, if at the time of the agreement, Kroger was, for the most part, selling or buying products from BMO and selling them through the traditional brick and mortar store, but then began to move away from that model to this distribution center, doesn't that, and you mentioned this at the beginning, you have no control over Kroger's business model. That's right. But you do have control over whether or not you're gonna honor the terms of an agreement that at the time it was entered into, you didn't entirely contemplate this new business model and so I think that's Mr. Davis's argument and the district court's position is that your client was essentially not honoring the terms of the agreement that he entered back when he entered it. Right, and we disagree with that, right? If what you're saying is that there should have been an amendment to the agreement, an agreement negotiated to deal with this sort of new set of circumstances or this new facility that doesn't fit the definition of a retail store and doesn't fit with the business model that had existed before, that's something that's possible and in fact, as I mentioned earlier, the record showed that in some circumstances elsewhere in the country, BMO has in fact done that with distributors like Mr. Davis to address changes in the market and the increased use of these e-commerce fulfillment centers. But just because there could be another agreement that was entered into to address a new circumstance or an amendment to an agreement that could be entered into to address the circumstance doesn't mean that you can rewrite the existing contract to address that new circumstance and that's what the district court did here, right? The plain terms of this agreement do not cover a facility like the fulfillment center. That's not Mr. Davis's fault, that's not BMO's fault, that's just the world changing from 2011 to 2020. The fact that the contract does not cover that situation, that's how contracts work and the district court had no authority to go back in time and to change the contract and make it into something that the parties at the time never intended for it to be. And once again, you can... Mr. Rubin, I think you're over time, but I'll ask my colleagues if they have any additional questions before you sit down. I do not, no. No, thank you. All right, you've got some time left for rebuttal. Thank you. Mr. McTus. Good morning and may it please the court. My name is Daniel McTus on behalf of the appellee, Walter Davis. First, I just wanted to say it's an honor to appear before this court. I'd like to address five specific points that appellant's counsel raised, but first I just want to remind this court that this case was not decided closely. The trial court in this case found, quote, what Bimbo has proposed as a definition frankly appears to have been contrived primarily for the purpose of ending a contract right it is not happy to be saddled with. That was one of four different occasions in the opinion where the trial judge found that Bimbo was simply making up definitions to suit its purposes here. The first point that I would like to address raised by appellant's counsel is that the parties agreed upon a definition and that this term was unambiguous. I'd like to point out that Bimbo's interrogatory responses, the only definition that Mr. Davis received for either term prior to trial was, quote, that the terms take on their ordinary meaning within the context of the distribution agreement and consistent with industry custom and trade usage. End quote. That's not a plain meaning and that should dispel any current argument that these terms are unambiguous. If these terms had plain meaning, Bimbo presumably would have stated them in the interrogatory response. So appellee does not agree that the terms are unambiguous as opposing counsel said when he was up here he said all the parties agreed that they were unambiguous. On summary judgment, Mr. Davis did posit that these terms were unambiguous and that they should be read in favor of Mr. Davis. The court obviously found otherwise, denied the summary judgment motions and made a finding as a matter of law that the terms were ambiguous. And I'd also like to talk about how the trial court reached that decision. So first of all, I think it's important. And so now you are in agreement that the terms are ambiguous. Mr. Davis does not dispute the court's finding that the terms are ambiguous, that's correct. And I think what's important is that Bimbo's primary position appears to be that because the terms are allegedly unambiguous, that the court should have just stopped at the words on the page of the dictionary definition. But the problem is Pennsylvania law, which applies here, allows and in fact requires a broader inquiry than that. Pennsylvania courts follow the restatement second of contracts. Section 212, comment B, I wanna quote at length if I can, but if you wanna follow along, Apelli's brief at page 25, this is all quoted there. The comment B states, it is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context. Accordingly, the rule stated in subsection one is not limited to cases where it is determined that the language used is ambiguous. Any determination of meaning or ambiguity should only be made in the light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade and the course of dealing between the parties, end quote. And so, Bimbo's just wrong that the court wasn't allowed to look at all this other evidence other than the words on the page prior to finding ambiguity. Here, it appears from the opinion that the trial court found ambiguity and then looked at this other evidence, but in any event, the outcome would have been exactly the same whether the judge looked at that evidence before or after finding ambiguity. And I think that's an important point. And then, opposing counsel says that the evidence that the district court considered was not appropriate course of dealing evidence or parole evidence. Right, right. And with respect to course of dealing evidence, I think Bimbo's just incorrect. Bimbo's position seems to be that because the parties had never previously encountered an automated fulfillment center, that course of dealing is out the window and none can be considered. But course of dealing evidence includes the party's course of dealing throughout their business relationship. And here, for approximately over a decade, every day, the party's engaged in a course of dealing. Part of that course of dealing, the court found Mr. Davis would go to his outlets. Some of the outlets, he would take all of the actions in section 4.1. But importantly, some outlets, he wouldn't. And for over a decade, that never stopped Mr. Davis from having those outlets as one of his outlets, and it never stopped him from getting paid. It was only once this Kroger Fulfillment Center came around that Bimbo's tune changed. So what services would Pelly provide to this fulfillment center? Store door delivery, Your Honor. What would he actually do? Because opposing counsel says that his services make no sense in the context of this facility. Right, and I think that's a good question, Your Honor. But I think appellant's counsel's position puts the cart before the horse. He's assuming that store door delivery involves all of the elements that are listed in section 4.1 and that they're expert positive. However, as the court found, and as every written definition, including their expert's written definition, provides, it's simply delivery to the store's door. And that's exactly what Mr. Davis would do here if allowed. And so when Bimbo's counsel says that he's not allowed to even deliver to the store because they make these bulk orders directly from manufacturers, well, then that's a problem for Bimbo. If the, I'm sorry, if the outlet doesn't want to buy directly from Mr. Davis, then Bimbo can't just go and breach the contract and say, well, I'm sorry, sir, you're out. They have to at least provide him the opportunity, and if the outlet doesn't want that, then no one services that store. That's the nature of the agreement. The next point I want to raise in response to Appellant's argument is that the fulfillment center doesn't, quote, sell anything. I just want to point out that the trial court found exactly the opposite as a factual matter. At joint appendix page 2434, the court stated, quote, the court specifically finds that because the Kroger Automated Fulfillment Center is a place of business that sells goods to consumers, it is a retail store, end quote. And so Appellant's position that it doesn't sell anything is just Appellant's counsel's opinion. It's not based in the record, and there was nothing to rebut the finding that the fulfillment center does sell goods to consumers. The third point I want to raise, and maybe I should have raised this sooner because it's potentially most important, is the purpose of the agreement and the party's intent. So with this, before we even get to that, that last point that you made, what's the record evidence that the fulfillment center actually sells goods to consumers? I understood that they collate and gather up the goods, but ultimately, do they go out directly from the fulfillment center to consumers? So to answer your first question, Your Honor, the record evidence is testimony from Mr. Davis at joint appendix 1497. He testified a trial question, and this is a question from the judge, Your Honor. I just want to clarify a couple of things that were said. So consumers go online and make purchases from this fulfillment center? Answer, yes. Question, and the purchases arrive at their home? Answer, yes. And so the evidence is testimony that purchases were made directly from this fulfillment center. Mr. Davis himself did it. He went online, he chose that fulfillment center, he made the purchases, and the goods arrived at his home, and there's testimony to that effect as well. And your second question, Your Honor, yes, these goods come directly from the fulfillment center. The bimbo goods and other products that are housed at the fulfillment center are delivered directly from the fulfillment center via truck to consumers' homes. And so with respect to the party's intent, Pennsylvania courts hold that the primary goal of contract interpretation is to ascertain the intent of the contracting parties. Here, Mr. Davis presented not only his testimony, but also the testimony of bimbo's representative who brokered the sale of the distribution rights to Mr. Davis, and he was also in the room when the parties physically signed the agreement in 2011. That individual, Mr. Michael Taylor, he testified that at the time of signing that agreement, all parties' interpretation was that retail stores would have included fulfillment centers like this, and by the way, fulfillment centers like this did exist in 2011, and other bimbo independent distributors were delivering to them under identical or substantially similar terms, such as retail store and direct store delivery. And Mr. Taylor also testified that direct, I'm sorry, store door delivery, the term used in Mr. Davis's agreement, certainly includes a location such as a fulfillment center because it only means delivery of the goods to the back door of the store. Was there any evidence about how those agreements were structured, those other agreements, whether they identified fulfillment centers differently from traditional retail outlets? Yes, Your Honor, and that goes to another point that Appellant's counsel made, that other independent distributors signed these other agreements that would capture fulfillment centers. The record includes copies of the original agreement signed by those independent distributors, and the evidence shows that those agreements specifically excluded locations such as fulfillment centers. They used bimbo's new form of distribution agreement that removed the term retail store altogether, and now uses a different term called direct store delivery that specifically includes language that excludes locations such as fulfillment centers and warehouses. And so any time that Appellant's counsel points to someone signing a separate agreement or a side agreement to include fulfillment centers, it's because that independent distributor uses a different current form of agreement that specifically excludes fulfillment centers. That's the only reason- Well, we're on that point, and I recall this, I think, and you can correct me if I'm wrong. One of the arguments that your colleague on the other side says is that the district court was incorrect to actually consider these subsequent agreements, because as a matter of law, those weren't part of any proper parole evidence consideration or otherwise relevant. Yes, and I think that goes to the case cited by the trial court, Pastore v. State Farm. The trial court did properly apply that. So Pastore stands for two principles. First, a clarified contract term cannot be used to prove the meaning of the original term. However, that later clarified term can be used to identify ambiguity, and that's the only reason that the trial court here relied on the subsequent agreement. It specifically found that because Bimbo later changed those terms, it just suggested ambiguity. The court didn't rely on that later clarified term to then define the meaning in the prior agreement with Mr. Davis, and so it was a proper application of the rule in Pastore v. State Farm, and it's consistent with Rule 407 of the Federal Rules of Evidence. Rule 407 only disallows evidence of repairs or subsequent changes for four limited reasons that are not at issue here. However, that rule specifically says that, and I'm just trying to find the exact language, bear with me, that Rule 407 states that the court may admit this evidence for another purpose, end quote. And so that's exactly what the trial court did here, consistent with the holding in Pastore, and in the appellee's brief, we also cited numerous other cases that stood for the same proposition that later clarified terms could be used to establish ambiguity. The next point I'd like to address is that somehow Section 4.1 of the agreement, which lists actions that an independent distributor may take to increase sales, somehow has anything to do with the definitions of store door delivery, or retail store for that matter. Store door delivery and retail store are defined solely by Exhibit B. Section 4.1, which is in the body of the agreement, and is titled Results, has nothing to do whatsoever with the definitions of those terms. In fact, Section 4.1 uses the phrase store door delivery and outlet, so it presupposes that, excuse me, so it presupposes that a location is already an outlet before Mr. Davis could take those actions to maximize sales. And I think what's important here is that you're never supposed to read terms to be superfluous or unnecessary. And if we followed Bimbo's argument, here, Section 4.1 would be nothing but superfluous, because if someone using store door delivery already had to engage in all those actions listed in 4.1, 4.1 wouldn't need to say what it says. It either wouldn't exist at all, or it would just say that independent distributor agrees to perform store door delivery. And I think that's the fallacy with the argument. 4.1 exists precisely because store door delivery doesn't already require these elements. And the last point with respect to Section 4.1, the parties, both parties, undisputed testimony at trial was that providing service consistent with good industry practice as required by Section 4.1 might mean, in instances, that you wouldn't perform any of those actions. It always comes down to whatever the particular outlet wants. If they say stock the shelves, that's what Mr. Davis is gonna do. If they say drop it off at the back door, like this fulfillment center apparently is, that's what Mr. Davis is gonna do. That's providing service consistent with good industry practice. Your Honors, I'm happy to address other points that were raised by appellants, but I actually prefer to hear your questions and see if there's any concerns with the underlying opinion that we can address. And if there's no more questions, I'm happy to yield the rest of my time to the court. I don't have any questions, but I'll defer to my colleagues if they have any additional questions. I also don't have any further questions. Neither do I. Well, thank you. Again, it was an honor. Thank you very much, Mr. McNussey. I'll just make a few points. My colleague focused on the term store-to-order delivery quite a bit. But like the district court, excise is an important part of the full phrase, which is purchasing by store-to-order delivery. And what that means in this context. And again, as noted, that refers, it must refer, to the business model here in which an independent distributor purchases product from BIMBO and resells to appellants. That's not just reflected in section 4.1. It's also reflected in section 3.1, where sale of products is defined to mean title to the products, transfers to the independent business partner, and then is sold to the outlet. So that's another context to define what an outlet means. An outlet is a business that purchases from an independent business partner, like Mr. Davis. In the same way, section 4.1 also provides context clues to what the parties understood an outlet would mean. It is actually my colleague's interpretation that reads section 4.1 out of the agreement. How can they say that it has nothing to do with the definition of outlet when the word outlet appears in section 4.1 and it describes what's supposed to happen at outlets? That's very important evidence about what the parties understood an outlet to be, and that's what this interpretive question is that's presented to the court. An outlet is a place where an IBP, like Mr. Davis, can develop and maximize sales within the sales area. An outlet is a place where an IBP can ensure that there's a fresh supply of products and outlets. It's a place where an IBP, like Mr. Davis, can engage in marketing programs and can remove all stale or off-code products and can cooperate with the owner of the outlet to ensure that they're maximizing the sales. Mr. Dean, you just described a number of things that your colleague on the other side would say that Mr. Davis could do, but was not required to do. And in fact, I thought the record evidence showed that in some instances, he didn't do some of those things because the store managers were inclined to do it themselves. That's right, but that's actually not relevant to this particular question, because this question is, we're trying to decide what is an outlet, right? And yeah, the question is not whether an IBP, like Mr. Davis, might get paid still if on a one-off occasion, he doesn't stock the shelves. This is important because it means that an outlet is a place with shelves, and that's what the party's intended when they entered into this contract, shelves that can be stocked. That's how you know what the party's intended. And maybe he doesn't always stock the shelves, but that's what the party's had in mind. I see I am out of time, unless there's another question. Can I ask one more question, Mr. McNictus? Describe the process by which consumers purchase goods from these fulfillment centers. Do you disagree with any aspect of that description? I do disagree with it. The district court actually found, it's in footnote four, and it's referred to elsewhere, that all transactions with consumers are accomplished online, on a website. And it is true that products that are stored at the warehouse, at the center, are picked and can be shipped to online purchasers the next day, but that's not the only thing that happens at the center. Goods are also shipped to other hubs. The evidence in the record showed that the way Kroger organizes its businesses has these big fulfillment centers, these huge warehouses in central locations that serve as like a wheel and spoke kind of a system. And so there are other outlets that can be grocery stores, it could be other warehouses, sort of in the spoke outside of the center of the wheel. So sometimes the fulfillment center will ship to a consumer online. Sometimes it will ship to another hub. Thank you. Do my colleagues have any additional questions? No. Thank you. Thank you. Thank you very much, Mr. Levine. I want to thank both council for their excellent arguments. My two colleagues will come down and greet you, maybe shake your hand twice, since I can't do it. And then we'll move on to our second case.
judges: Albert Diaz, Stephanie D. Thacker, Allison J. Rushing